Andrew M. Kohlmetz, OSB #955418
The Law Office of Andrew M. Kohlmetz, LLC
741 SW Lincoln Street
Portland, OR 97201
Tel: (503) 224-1104
Fax: (503) 224-9417
Email: andy@kshlawyers.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No.  3:16-CR-00051-09-BR |
| | ) |
| Plaintiff, | ) TABLE OF CONTENTS AND |
| | ) AUTHORITIES FOR |
| | ) DEFENDANT'S OBJECTIONS TO |
| vs. | ) REVISED FINAL PRESENTENCE REPORT |
| | ) AND SENTENCING MEMORANDUM |
| JASON PATRICK, | ) |
| | ) |
| Defendant. | ) **Sentencing: February 15, 2018 9:00 AM** |
| | ) |

**Table of Contents**

Introduction…………………………………………………………………………………1

I.     Mr. Patrick's Objections to the Revised Final PSR………………………………2
II.    Determining the Guidelines Range………………………………….............4
    a.  Base Offense Level………………………………………………………………4
    b.  Sentencing Enhancements: Standard of Proof……………………………...4
    c.  Possession and Threatened Use of a Firearm Under U.S.S.G. § 2A2.4(b)(1)...6
    d.  The Terrorism Enhancement Under U.S.S.G. §3A1.4, Application note 4…...8
       i.  Application Note 4 is Void as a Matter of Law…………….................8
          A.  Even if Not Void, The Enhancement Does Not Apply to Mr.Patrick's Conviction Under 18 U.S.C. § 372..…………10
          B.  Application Note 4 does not apply to convictions Under 18 U.S.C. § 372………………………………………12
    e.  Leadership Role Enhancement under U.S.S.G. § 3B1.1……………………13
       i.  Mr. Patrick had no leadership role prior to the occupation of the Refuge……………………………………………………………..15
       ii.  Mr. Patrick had no leadership role during the occupation itself……..22
TABLE OF CONTENTS AND AUTHORITIES…………………………………………… i

f.   Acceptance of Responsibility under U.S.S.G. § 3E1.1.........................25
III.   Mr. Patrick's personal history and characteristics....................................28
IV.   Mr. Patrick's Guidelines Calculations and Sentencing Recommendation..........41

**Table of Authorities**

### Cases

*Albritton, United States v.*, 622 F.3d 1104 (9th Cir. 2010)........................................7

*Avila, United States v.*, 95 F.3d 887 (9th Cir. 1996)..............................................14

*Beckner, United States v.*, 983 F.2d 1380 (6th Cir. 1993)........................................7

*Cortes, United States v.*, 299 F.3d 1030 (9th Cir. 2002)........................................25

*Frankhauser, United States v.*, 80 F.3d 641 (1st Cir.1996)......................................15

*Hoac, United States v.*, 990 F.2d 1099 (9th Cir.1993)...........................................15

*Hooker, United States v.*, 997 F.2d 67 (5th Cir. 1993)...........................................7

*Hopper, United States v.*, 177 F.3d 824, 833 (9th Cir.1999)..................................4, 5

*Jordan, United States v.*, 256 F.3d 922 (9th Cir. 2001)........................................4, 5

*Jordan, United States v.*, 291 F.3d 1091 (9th Cir. 2002).........................................15

*Litchfield, United States v.*, 959 F.2d 1514 (10th Cir. 1992)....................................15

*Mares-Molina, United States v.*, 913 F.2d 770, (9th Cir. 1990)...............................15

*McKinney, United States v.*, 15 F.3d 849 (9th Cir. 1994)........................................26

*Mohamed, United States v.*, 757 F.3d 757 (8th Cir. 2014)......................................13

*Ramos-Medina, United States v.*, 706 F.3d 932 (9th Cir. 2013)............................25, 27

*Restrepo, United States v.*, 946 F.2d 654 (9th Cir. 1991)........................................4

*Shell, United States v.*, 789 F.3d 335 (4th Cir. 2015)...........................................10

*Stinson v. United States*, 508 U.S. 36 (1993)..................................................9, 10

*Stoterau, United States v.*, 524 F.3d 988 (9th Cir. 2008)........................................12

Valensia, United States v., 222 F.3d 1173 (9th Cir. 2000).........................................5

*Woods, United States v.*, 335 F.3d 993 (9th Cir. 2003)..........................................15

*Wright, United States v.*,  747 F.3d 399 (6th Cir. 2014)........................................13

TABLE OF CONTENTS AND AUTHORITIES.................................................. ii

The Law Office of Andrew M. Kohlmetz, LLC
741 SW Lincoln St.
Portland, OR 97201
(503) 224-1104

**Statutes**

18 U.S.C. § 372…………………………………………………………...9-13

18 U.S.C. § 1030…………………………………………………………….8

18 U.S..C § 2332…………………………………………………………..9-13

18 U.S.C. § 3553…………………………………………………………...27

18 U.S.C. § 3583………………………………………………………....41, 42

18 U.S.C. § 3624………………………………………………………….42


**Sentencing Guidelines Provisions**

U.S.S.G. § 1B1.1…………………………………………………………6,7

U.S.S.G. § 2A2.4………………………………………………………..3-7, 41

U.S.S.G. § 2X1.1………………………………………………………..4, 41

U.S.S.G. § 3A1.4………………………………………………………..2, 8-12

U.S.S.G. § 3B1.1………………………………………………….2, 3, 13, 14, 24

U.S.S.G. § 3E1.1…………………………………………………..3, 25, 26, 41

U.S.S.G. Amendment 637 (2002)……………………………………….8-11


**Other**

Public Law 107-56 (2001)………………………………………………….8

Public Law 104-132 (1996)………………………………………………..9, 10


TABLE OF CONTENTS AND AUTHORITIES……………………………………… iii

The Law Office of Andrew M. Kohlmetz, LLC
741 SW Lincoln St.
Portland, OR 97201
(503) 224-1104

Andrew M. Kohlmetz, OSB #955418
The Law Office of Andrew M. Kohlmetz, LLC
741 SW Lincoln Street
Portland, OR 97201
Tel: (503) 224-1104
Fax: (503) 224-9417
Email: andy@kshlawyers.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:16-CR-00051-09-BR |
| Plaintiff, | |
| vs. | DEFENDANT'S OBJECTIONS TO REVISED FINAL PRESENTENCE REPORT AND SENTENCING MEMORANDUM |
| JASON PATRICK, | |
| Defendant. | **Sentencing: February 15, 2018 9:00 AM** |

**Introduction:**

Mr. Patrick is set to be sentenced after having been convicted by a Jury of Count One of the Superseding Indictment herein, and by the Court of counts One, Two and Six of the misdemeanor Information. The Court is well aware of the general legal framework of federal criminal sentencing. This pleading will turn to the specifics directly involved in Mr. Patrick's case.

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 1

### I.    Mr. Patrick's Objections to the Revised Final PSR

The addendum to the revised final presentence report lists both resolved and unresolved objections to the report. This is inaccurate. To Mr. Patrick's mind, the "resolved" objections remain unresolved. The draft presentence report that was provided to the parties contained neither a recommendation that a terrorism enhancement pursuant to U.S.S.G. §3A1.4, Application note 4 be applied, nor that a 4-level leadership role enhancement under U.S.S.G. §3B1.1(a) be applied to Mr. Patrick. These two enhancements were first added to the presentence recommendation in the final report. Mr. Patrick has had no opportunity to weigh to lodge an objection to these inclusions. Thus, they too remain unresolved. Mr. Patrick objects to both proposed enhancements as more specifically argued below.

Similarly, some specific language was added to the draft PSR to which Mr. Patrick has yet has had no opportunity to object. Mr. Patrick objects to the following language in the revised final presentence report which was added to the report after the draft report had been distributed and objected to.

- **Paragraphe 34a**.  Mr. Patrick objects to the following: "Evidence indicated that **Patrick** was a high-level leader and organizer of the conspiracy, from the beginning, who recruited and organized gunmen and other followers on MNWR."

- **Paragraph 34b.** Mr. Patrick objects to the language that he played a "central role during the occupation; That he frequently appeared at press conferences (with Ammon and Ryan Bundy, and that he was also one of the last to leave the refuge. He objects to the characterization that he "led" a unanimous vote. Rather, he vociferously objected to the plans of other defendants like Blaine Cooper who advocated a running

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 2

gun-battle with federal law enforcement and asked the group to vote on whether they should get into a gun battle with law enforcement or remain peacefully where they were. This is best reflected in Government's trial exhibit 402.

- **Paragraph 52.** Mr. Patrick objects to the requested 4-level leadership role enhancement under U.S.S.G. §3B1.1(a).

- **Paragraph 55.** Based both upon his previously lodged objection to the 3-level enhancement for possession and threatened use of a firearm under U.S.S.G. §2A2.4(b)(1), and to his current objection to the proposed 4-level leadership role enhancement, Mr. Patrick objects to the Adjusted Offense Level (Subtotal) of 17. The Adjusted Offense Level (Subtotal) should be 10.

- **Paragraph 58.** Mr. Patrick objects to the Total Offense Level of 17. The correct Total Offense Level is 10.

- **Paragraph 79.** Mr. Patrick objects to the Guidelines Provisions calculations. The correct total offense level is 10. At the correct criminal history category of I, the guidelines imprisonment range is 6 – 12 months.

The addendum accurately notes the remaining unresolved objections that Mr. Patrick submitted in response to the draft presentence report. These objections are as follows:

- **Face Sheet (Identifying Data).** Mr. Patrick continues to object to the use of the SSN#, FBI#, USM#, State ID# and PACTS#, to identify him.

- **Paragraph 47.** Mr. Patrick objects to the denial of a 2-level reduction in offense level for acceptance of responsibility under U.S.S.G. §3E1.1.

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 3

- **Paragraph 49.** Mr. Patrick objects to the 3-level enhancement for possession and threatened use of a firearm under U.S.S.G. §2A2.4(b)(1).

## II.    Determining the Guidelines Range.

### a.  Base Offense Level

On one thing the parties can agree. The unadjusted base offense level for Mr. Patrick's conviction for Conspiracy to Impede a Federal Officer is 10. U.S.S.G. §2X1.1(a), §2A2.4(a). Application of U.S.S.G.  §2A2.4(b). Beyond this however, the government seeks a number of enhancements in aggravation of Mr. Patrick's sentence.

Because of the aggregate disproportionate impact the requested enhancements have on the sentence, as argued below, the Government must prove each requested enhancement by clear and convincing evidence.

### b.  Sentencing Enhancements: Standard of Proof.

Normally under the guidelines, sentencing enhancements must be proven only by a preponderance of the evidence.  *United States v. Restrepo*, 946 F.2d 654, 658–59 (9th Cir. 1991). However, when a sentencing factor has an extremely disproportionate effect on the sentence relative to the offense of conviction, due process requires that the government prove the facts underlying the enhancement by clear and convincing evidence. *United States v. Hopper,* 177 F.3d 824, 833 (9th Cir.1999), *cert. den., McKendrick v. United States,* 528 U.S. 1163 (2000). This rule applies equally if the disproportionate impact is the result of an individual, or multiple, aggregated enhancements. *United States v. Jordan*, 256 F.3d 922, 928 (9th Cir. 2001).

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 4

Whether a requested enhancement, either alone or in the aggregate has a disproportionate impact is made on a case-by-case basis and determined by the "totality of the circumstances." *United States v. Valensia,* 222 F.3d 1173, 1182 (9th Cir. 2000), *cert. granted, judgment vacated,* 532 U.S. 901, (2001).  In broad terms, the court must consider the disparity between the unenhanced and enhanced sentencing range. *Id*. While no single factor is conclusive, the Ninth Circuit has identified at least non-exclusive factors the sentencing court may consider. *Id*. These factors are: (1) whether the enhanced sentence falls within the maximum sentence for the crime alleged in the indictment; (2) whether the enhanced sentence negates the presumption of innocence or the prosecution's burden of proof for the crime alleged in the indictment; (3) whether the facts used to justify the enhancement create new offenses requiring separate punishment; (4) whether the increase in the sentence is based on the extent of a conspiracy; (5) whether the increase in the number of offense levels is four or less; and, (6) whether the length of the enhanced sentence is more than double the length of the unenhanced sentence, particularly in cases where the defendant would otherwise have received a relatively short sentence." *Id.*

A seven-level enhancement which increased the defendant's sentencing range from 24-30 months to 63-78 months has been held to require proof by clear and convincing evidence. *Hopper,* 177 F.3d at 833. The touchstone of the analysis is the impact on the unenhanced sentence. See *Jordan,* 256 F.3d at 928 (reviewing cases.) Thus, as here, where the unenhanced sentence range at the base offense level is quite low, the clear and convincing standard will be triggered rather quickly as enhancements are applied simply based on the impact of the length of the enhanced sentence.

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 5

By any measure, the government's enhancement requests when taken together result in a "extremely disproportionate impact" on Mr. Patrick's sentence. Mr. Patrick's base offense level is 10, the government is requesting a combined 13-level upward enhancement to his sentence. If granted, his offense level is more than doubled, and his advisory sentencing guidelines range balloons from 6-12 months in custody to 46-57 months in prison: a 667 % increase at the low-end and a 375% increase at the high end. The clear and convincing standard applies to each of the government's requested enhancements.

### c.  Possession and Threatened Use of a Firearm Under U.S.S.G. § 2A2.4(b)(1).

As an initial matter Mr. Patrick urges the court to reject the enhancement as Mr. Patrick was acquitted at trial of Count 2 of the Superseding Indictment, charging him with possession of a firearm in a federal facility. There is simply no evidence that Mr. Patrick ever threatened to use a firearm. To the extent the enhancement is sought based on the alleged possession and threatened use of firearms by other persons at the Refuge, Mr. Patrick maintains that any such threatened use was not reasonably foreseeable to him.

Assuming the court finds that Mr. Patrick did possess a firearm while at the refuge, there is no evidence that he threatened to use any such firearm. The relevant Guidelines do not define the term "threatened." *See U.S.S.G. §§ 2A2.4, 1B1.1, cmt. n. 1*. The Guidelines do, however, define the term "brandished," as follows:

> 'Brandished' with reference to a dangerous weapon (including a firearm) means that all or part of the weapon was displayed, or the presence of the weapon was otherwisemade known to another person, in order to intimidate that person, regardless of whether the weapon was directly visible to that person. Accordingly, although the dangerous weapon does not have to be directly visible, the weapon must be present.

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 6

*U.S.S.G. § 1B1.1, cmt. n.1(C)*. The Guidelines also define what it means to "otherwise use" a firearm:

> 'Otherwise used' with reference to a dangerous weapon (including a firearm) means that the conduct did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon.

*U.S.S.G. § 1B1.1, cmt. n.1(I)*. The Ninth Circuit has adopted the following distinction between "brandish" and "otherwise use": "[A] weapon is 'otherwise used' once there is 'specific leveling' of the weapon at another person[,]" whereas "'[b]randishing' is a 'general display of weaponry.'" *United States v. Albritton*, 622 F.3d 1104, 1107 (9th Cir. 2010). Clearly, something more than brandishing, displaying or possession of a firearm is required. What is required is a threat of use that goes beyond brandishing to conduct akin to a specific leveling at another person. In other words it must be a threat to shoot someone.

What then is a threat of use, or threatened use? Must the threat be verbal? Can it be demonstrative? If to "otherwise use" includes levelling or pointing a firearm at another, how does one threaten to do so?  At least one circuit has held that U.S.S.G. §2A2.4(b) contemplates verbal threats in conjunction with possession of the firearms. *United States v. Hooker*, 997 F.2d 67, 75 (5th Cir. 1993), which held that "§2A2.4 is meant to apply to possession of weapons and *verbal* threats" (emphasis added). Another question arises as to whom must the threat be directed? Under U.S.S.G. §2A2.4, the communicated threat must be directed at the obstructed or impeded federal officers, in this case employees of the MNWR or BLM, or is it enough to threaten others? *See for example*, *United States v. Beckner*, 983 F.2d 1380, 1388 (6th Cir. 1993) (Graham, J., dissenting) (U.S.S.G. §2A2.4(b)(1) focuses on and is limited to "conduct directed

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 7

toward the officers who are being impeded or resisted, and does not take into account

defendant's acts against persons who are not officers."). Common sense dictates that the

guideline is intended to capture threats of unlawful use of the firearm. In essence a threat to

shoot. In the absence of clear and convincing evidence that Mr. Patrick verbally threatened to use

a firearm to shoot an employee of the USFWS or BLM, the court should reject the enhancement.

### d.   The Terrorism Enhancement Under U.S.S.G. §3A1.4, Application note 4.

The government seeks an upward departure under Application Note 4 of U.S.S.G. §

3A1.4 (Terrorism). The Application note is void as a matter of law. Furthermore, it does not

apply to Mr. Patrick's conviction.

### i.   Application Note 4 is Void as a Matter of Law.

The Sentencing Commission added Application Note Four to the Guidelines in 2002, in

connection with "a six-part amendment that responds to" the USA PATRIOT Act of 2001, Pub.

L. 107-56. *See U.S.S.G., Vol. 2, App. C, Amendment 637* ("Amendment 637"). Notably,

Amendment 637 cites no particular statutory authorization applicable to Application Note Four.

The only explicit directive to the Sentencing Commission in the USA PATRIOT Act relates to

computer fraud and abuse under 18 U.S.C. § 1030. *See Pub. L. 107-56 § 814.* With the exception

of Application Note Four, Amendment 637 responds, in general, to the concrete ways in which

Congress expanded and strengthened the federal criminal code in the wake of the 9/11 attacks.

*See generally Amendment 637.* By contrast, the Commission explained that it added the

departure in Application Note Four "rather than a specified guideline adjustment, because of the

expected infrequency of [such] terrorism offenses and to provide the court with a viable tool to

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 8

account for the harm involved during the commission of these offenses on a case-by-case basis."
*See Amendment 637.*

However, as the Commission explained more candidly in the text of Application Note Four itself, the Commission had no statutory authority to expand the reach of section 3A1.4 beyond the list of federal crimes of terrorism set forth in 18 U.S.C. § 2332b(g)(5): "By the terms of the directive to the Commission in section 730 of the Antiterrorism and Effective Death Penalty Act of 1996 ["AEDPA"], the adjustment provided by this guideline applies only to federal crimes of terrorism." *U.S.S.G. §3A1.4, cmt. n.4.* That assertion is correct. AEDPA section 730 provides:

> The United States Sentencing Commission shall forthwith, in accordance with the procedures set forth in section 21(a) of the Sentencing Act of 1987, as though the authority under that section had not expired, amend the sentencing guidelines so that the chapter 3 adjustment relating to international terrorism ***only applies*** to Federal crimes of terrorism, as defined in section 2332b(g) of title 18, United States Code.

*Pub. L. 104-132 § 730 (emphases added).* Congress did not enumerate a conviction under 18 U.S.C. §372 in section 2332b(g). *See 18 U.S.C. § 2332b(g)(5)(B).*

"[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993). Application Note Four runs afoul of *Stinson* because—as the Commission openly confessed—the Note cannot be squared with AEDPA's requirement that section 3A1.4 may only

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 9

apply to federal crimes of terrorism within the meaning of 18 U.S.C. § 2332b(g). *Pub. L. 104-132 § 730*. Put another way, Application Note Four "violates . . . a federal statute[.]" *Stinson*, 508 U.S. at 38. Relatedly, because section 3A1.4 cannot apply to non-terrorism crimes such as Mr.Patrick's—nor does it—the Application Note is inconsistent with and a plainly erroneous reading of the Guideline itself. *See, e.g., United States v. Shell*, 789 F.3d 335, 345 (4th Cir. 2015) (Commentary lacks "freestanding definitional power" and instead must be linked to the text of the Guideline) (quotation marks omitted). Because Application Note Four impermissibly exceeds the Sentencing Commission's statutory authority and the text of section 3A1.4, it is void *ab initio*.

> **ii.    Even if Not Void, The Enhancement Does Not Apply to Mr. Patrick's Conviction Under 18 U.S.C. § 372.**
>
> **A. Application Note 4 does not apply to convictions under 18 U.S.C. § 372.**

Application note 4 to that guideline provides in pertinent part:

> there may be cases in which (A) the offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct but the offense involved, or was intended to promote, an offense other than one of the offenses specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B);… In such cases an upward departure would be warranted,..

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 10

As noted above, this Application Note was added to the Sentencing Guidelines in 2002 as part of Amendment 637 which reads in pertinent part.

> …the amendment adds an encouraged, structured upward departure in §3A1.4 (Terrorism) for offenses that involve terrorism but do not otherwise qualify as offenses that involved or were intended to promote "federal crimes of terrorism" for purposes of the terrorism adjustment in §3A1.4. The amendment provides an upward departure, rather than a specified guideline adjustment, because of the expected infrequency of these terrorism offenses and to provide the court with a viable tool to account for the harm involved during the commission of these offenses on a case-by-case basis. In addition, the structured upward departure provision makes it possible to impose punishment equal in severity to that which would be imposed if the §3A1.4 adjustment actually applied.

*U.S.S.G. Supplement to Appendix C, Amendment 637, November 1 2002 at page 244*. It is clear that this amendment was specifically adopted to capture offenses that "involve" terrorism but are not listed as a federal crime of terrorism in in 18 U.S.C. § 2332b(g)(5).

This case does not involve terrorism. Mr. Patrick's conduct in the conspiracy at issue here impeded federal employees of the U.S. Fish and Wildlife Service from the performance of their duties by physically occupying the Refuge and displacing them from their workplaces. There is no evidence that Mr. Patrick made any threats of violence against anyone. Nor is there evidence that such threats would have been reasonably foreseeable to him.

Application note 4 begins with the premise that "there may be cases in which (A) the offense was calculated to influence or affect the conduct of government by intimidation or coercion…" A conviction for a violation of 18 U.S.C.  §372 necessarily requires an intent to impede a member of the government by "force threat or intimidation." To some degree every section 372 conviction will necessarily "influence or affect the conduct of government by intimidation or coercion." The base offense level assigned to a conviction for Conspiracy to

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 11

Impede already takes into account the defendant's intent to impede a federal employee or agent by force threat or intimidation. That very same element cannot then be used to justify an upward departure. This would amount to impermissible double counting.

Impermissible double counting occurs when one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines." *United States v. Stoterau*, 524 F.3d 988, 1001 (9th Cir. 2008)(citation omitted).

Under the plain language of the statute then, every conviction for a violation of 18 U.S.C. §372 would trigger the upward departure provision in U.S.S..G § 3A1.4, Application note 4. This would be an absurd result, which in the case of this statute would convert all presumptive sentences into departure sentences.  Application of the departure in these circumstances amounts to a double counting of the elements of the offense of conviction. The note should be read to require conviction for a generic criminal offense – i.e. arson – that was undertaken for the purpose of influencing or affecting the conduct of government by intimidation or coercion, where those purposes are not normally elements of the offense itself.

### B.  Application Note 4 Requires Proof of Specific Intent.

Application note 4's language to the affect that there may be some cases in which the offense was "calculated to influence or affect the conduct of government by intimidation or coercion" appears to be taken directly from the statutory definition of a federal crime of terrorism at 18 U.S.C. §2332b(g)(5) to which U.S.S.G. § 3A1.4 would apply. And while perhaps an open issue in this circuit, a number of circuits which have considered this language have held

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 12

that it imposes a specific intent requirement. *See United States v. Wright*, 747 F.3d 399, 408-9

(6th Cir. 2014).(listing 4th, 2nd, and 7th Circuit cases to that effect.) Factually, there is no

evidence that Mr. Patrick's offense was specifically calculated to influence or affect government

conduct beyond what the simple conviction under 18 U.S.C. § 372 required. Mr. Patrick's intent

in participating in the occupation was to draw attention to the plight of the Hammond family and

to a lesser degree to spur a lawsuit concerning the constitutionality of the Federal government's

ownership of lands. Application of the enhancement requires the court to rely not on Mr.

Patrick's motives in participating in the occupation of the Refuge, but rather the object of his

participation in the offense.  Was Mr. Patrick's offense calculated – did he specifically intend it –

to influence or affect the conduct of government beyond what is required of a conviction under

18 USC § 372?  *See United States v. Mohamed*, 757 F.3d 757, 760 (8th Cir. 2014)(stating

Section 2332b(g)(5)(A) does not focus on the defendant but on his 'offense,' asking whether it

was calculated, i.e., planned—for whatever reason or motive—to achieve the stated

object.)(citation omitted). The answer is clearly and simply "No."


   e. **Leadership Role Enhancement under U.S.S.G. § 3B1.1.**

  Mr. Patrick was vocal and visible during the "occupation" of the Refuge. Of that there is

no doubt. But application of an aggravating role enhancement under the Guidelines requires

more. The application of aggravating role adjustments under the Guidelines are controlled by

United States Sentencing Guideline §3B1.1 which provides:

> Based on the defendant's role in the offense, increase the offense
> level as follows:
> **(a)** If the defendant was an organizer or leader of a criminal activity
>  that involved five or more participants or was otherwise extensive,

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 13

increase by 4 levels.

**(b)** If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise   extensive, increase by 3 levels.

**(c)** If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

Application note 2 to section 3B1.1 provides further clarity, providing:

> To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants. An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization

Application note 4 further refines the analysis in providing:

> In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.

Mr. Patrick was not an "organizer," "leader," "manager," or "supervisor," as those terms are defined in the guidelines. For the four-level upward adjustment the government must demonstrate that the defendant exercised sufficient control over other others involved in the commission of the offense or that he was responsible for organizing others for the purpose of committing the offense. *United States v. Avila*, 95 F.3d 887, 889 (9th Cir. 1996). More importantly, any adjustment under the guideline whether leader, organizer, manager or

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 14

supervisor requires proof of some degree of control or authority over others involved in the commission of the offense. *United States v. Mares-Molina*, 913 F.2d 770, 773 (9th Cir. 1990).

It is not enough that Mr. Patrick may have played a visible, even important, role in this offense. *See United States v. Woods*, 335 F.3d 993 (9th Cir. 2003), *Cf United States v. Litchfield,* 959 F.2d 1514 (10th Cir. 1992)(defendant can be important, even essential to the offense and not receive the adjustment.) That Mr. Patrick was more visible than others or that he was more vocal than others, or that he espoused strong views is similarly insufficient. As the Ninth Circuit has noted:

> Moreover, just as "utiliz[ing] organizational skills" in a criminal endeavor" is not the same as organizing other conspirators," having leadership qualities, such as a strong personality, does not in itself prove that the defendant exercised them to support underlying criminal conduct.

*United States v. Hoac,* 990 F.2d 1099, 1111 (9th Cir.1993) (internal quotation marks omitted); *see also United States v. Frankhauser,* 80 F.3d 641, 655 (1st Cir.1996) (vacating sentence enhancement for leadership role and explaining that "[t]he court must focus on *what the defendant did,* in relation to at least one other participant, in the commission of the offense." (emphasis in original)). *United States v. Jordan*, 291 F.3d 1091, 1098 (9th Cir. 2002). Mr. Patrick exercised no authority over anyone at the Refuge. Nor is there evidence sufficient to show that he exercised any planning or organizational authority at the Refuge or in the events leading to the occupation.

### i.  Mr. Patrick had no leadership role prior to the occupation of the Refuge.

Prior to reading about the Hammond case in November of 2015, Mr. Patrick was not affiliated with Operation Mutual Defense or any of the other "patriot" organizations that were at

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 15

the time actively planning some sort of direct action relating to the Hammond family. Mr.

Patrick learned of the Hammonds from Ammon Bundy's postings on the Bundy family's website

(Bundyranchblogspot.com) in late October or early November of 2015. Mr. Patrick had no role

or affiliation with the Bundyranchblogspot.com, other than reposting information he found there.

He begins posting about the Hammond case on his own personal Facebook account on

November 7, 2015 when in two separate posts he posts links to an article concerning the

Hammonds found on the Bundy family's site. (Defense Tr. Ex. 1105) During this time Mr.

Patrick was posting actively about the police-shooting-death of an Council Idaho rancher named

Jack Yantis. Between November 7, and November 15 of 2015 Mr. Patrick travelled to Council

Idaho to report on the case on his Facebook page and other social media. He returns to

Washington State and begins posting about the Hammonds again on November 22, 2015, with a

link to a video of Ammon Bundy claiming the Hammond family had been threatened by the

government. (Defense Tr. Ex. 1108 ) By November 24, 2017, he is publicly posting his

intentions to go to Harney County to conduct his own investigation into the Hammond matter

and to winter-camp in the vicinity while he does so. Also, on November 24, 2015, Mr. Patrick

leaves a message on Ammon Bundy's voicemail indicating that although he is unsure if Ammon

Bundy remembers him that he wanted Mr. Bundy to call him back and discuss the video he had

recently posted concerning the Hammonds (Defense Tr. Ex. 1045).

     Mr. Patrick had no role in the drafting of the Redress of Grievances document which was

created by the Bundy's and circulated electronically as a justification for their proposed direct

action in Burns. On December 11, 2015 Mr. Patrick simply posted a link to the Redress of

Grievances on his Facebook page with no comment. Nor did he author any of the "histories" of

the Hammond case that the Bundy's and other circulated on the internet to galvanize support for their cause.  Mr. Patrick did not speak for the Bundy family. Nor did he speak for any other of the other "patriot" groups rallying to and assisting in planning what would ultimately become the January 2nd protest in Burns and the subsequent occupation of the Refuge.

Mr. Patrick first travelled to Harney County from his residence in Mukilteo Washington on or about December 8, 2015. His Facebook postings indicate this was a last-minute decision for him. In other Facebook messages provided in discovery, it is made clear that Mr. Patrick's plans are his own and are not tied to those of Mr. Payne. Mr. Payne clearly indicates that his plans, and we can assume others involved with him in planning the protest in Burns, were separate from any plans that Mr. Patrick had. Mr. Patrick met codefendant Ryan Payne in Harney County sometime after December 8, 2015.

Mr. Payne, along with Ammon Bundy and others, had already been active in Harney County. On November 5, 2015, Mr. Payne and Ammon Bundy met with Harney County Sheriff Ward where, in essence Ammon Bundy and Ryan Payne told Sheriff Ward that if he did not intervene in the Hammond case there would be extreme civil unrest and that thousands of people would descend on Harney County and do his job for him. Over the next few weeks Ammon Bundy and others communicated with Sheriff Ward, essentially demanding he intervene and somehow prevent the federal government form taking the Hammonds back into custody.

A second, more disturbing meeting between Sheriff Ward, Ammon Bundy, Ryan Payne and other Bundy sympathizers occurred on November 19, 2015 at the county law library in Burns. At this meeting members of various "patriot" groups such as the Central Oregon Constitutional Guard, The Oathkeepers, the Pacific Patriots Network and the Idaho 3-percenters

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 17

were present. During and after this meeting into the month of December, Ryan Payne explicitly acknowledged his leadership role in these events and made thinly veiled threats against Sheriff Ward. This included approaching one of his deputies and requesting he arrest Sheriff Ward. According to Sheriff Ward, Blaine Cooper even posted a Facebook request for "shooters" and a "call to arms" that Mr. Cooper deleted when confronted about it by one of Sheriff Ward's deputies.  Mr. Patrick was not involved in these activities. Mr. Patrick was not present for any of the meetings, conversations or messages that occurred in November and early December, 2015 between Sheriff Ward, Ammon Bundy, Ryan Payne and others. Mr. Patrick's only contact with Sheriff Ward until shortly before a December 15, 2015 "town hall" at the Harney County Fairgrounds was a message he left for Sheriff Ward with the Harney County Emergency Dispatch Center in which he inquired about the Hammonds and left his name and phone number (Defense Tr. Ex. 1047). There was nothing threatening or intimidating in Mr. Patrick's voicemail. Nor did it indicate he was speaking for anyone other than himself.  Sheriff Ward first encountered Mr. Patrick when he was assisting Ryan Payne and others in passing out flyers in Burns announcing the planned "town hall" meeting. This meeting was called for by Ammon Bundy. At this time Mr. Patrick's role was not that of a leader or organizer, but something akin to a volunteer. He wanted to help out. He passed out flyers for a meeting that was planned and organized by others.

On December 15, 2015, Mr. Patrick did attend this "town hall" meeting at which Ryan Payne and Ammon Bundy were the featured speakers, urging those from the local area who attended to form a "Committee of Safety" to ostensibly convene an investigation and intervention into the return of the Hammonds to the federal penitentiary. Mr. Patrick did speak

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 18

briefly from the audience during this meeting expressing his support of the ideas espoused by the two leaders of the group present Ryan Payne and Ammon Bundy. After this meeting Ammon Bundy had more contact with Sheriff Ward when, on December 16th, he confronted Sheriff Ward and demanded an answer to why his redress of grievances was not answered. Throughout this period in December leading up to the January 2 protest, Sheriff Ward had numerous contacts and interactions with the leaders of the group(s) organizing the actions in Burns and planning the protest of January 2. Mr. Patrick was not among those individuals.

After attending the "town hall" meeting on December 15, 2015, Mr. Patrick returned to Washington in order to be present at court hearings in a federal criminal case pending against an ex-United States Marine, Schuyler Barbeau case, in Seattle Washington on and around December 21, 2015. Mr. Patrick traveled with Blaine Cooper, Joseph O'Shaugnessy and Jon Ritzheimer, three of the admitted leaders of the planning of the events in Burns. All four are documented outside the federal courthouse in Seattle concurrent with the hearing in the Barbeau case.

Mr. Patrick returned to Harney County on or around December 23, 2015. On December 26th, Mr. Patrick appears in a brief video that was produced by Blaine Cooper's company Third Watch Productions. (Gov't Tr. Ex: 33) In the video, Joseph O'Shaughnessy, Blaine Cooper, John Ritzheimer and Mr. Patrick all speak. Blaine Cooper begins by announcing they are in Burns "for the Hammonds." O'Shaughnessy continues by characterizing the video as a "call out" and "alert" to all "patriots, constitutionalists, militias and good Americans" to come to the Burns Safeway on January 2, 2016 for a "patriot convoy." Jon Ritzheimer speaks about his military service and his duty to protect the Constitution. Blaine Cooper interjects that it is time now to get

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 19
The Law Office of Andrew M. Kohlmetz
741 SW Lincoln St.
Portland, OR 97201
(503) 224-1104

up off the couch and stand for the Constitution. Mr. Patrick then concludes the video by pulling

out his ubiquitous pocket Constitution and declaring that it, and specifically Article I, section 8

clause 17, is in violation and that the federal government is charging a rancher for terrorism "for

burning grass." He concludes by stating that this is ridiculous and that it is time to stand up and

say "no thank you, we don't need that here." Mr. Patrick's participation in this video is not

evidence of any leadership role in the instant offense. It is nothing more than a statement of his

sympathy for the Hammonds, his belief that the federal government was violating the United

States Constitution, and that it was time to say "enough" and "no thank you," by attending the

protest in Burns.

On December 29, 2015, Mr. Patrick was present at a meeting at a residence in Burns

where Ammon Bundy divulged his idea that protesters from the January 2nd rally should occupy

the Refuge. According to trial testimony of Ammon Bundy, B.J. Soper and Blaine Cooper,

present at this meeting were Jospeh O'Shaughnessy, Jon Ritzheimer, B.J. Soper, Ryan Payne,

Corey LeQuieu and others. There is a stark conflict in the testimony of Blaine Cooper as

compared to that of B.J. Soper and Ammon Bundy concerning the scope of this meeting. While

both Mr. Soper and Mr. Bundy described a perfunctory meeting where the participants listened

to Ammon Bundy's idea and expressed either their support or opposition, Mr. Cooper described

a more detailed discussion. The defense urges the Court to give little credence to the self-serving,

and at other times perjurous testimony of Mr. Cooper in this regard.

Regardless of any credibility determinations however, Mr. Patrick's simple attendance at

that meeting is not evidence of any leadership role. No testimony was elicited that Mr. Patrick

specifically participated in this meeting in any way other than being present. Other codefendants

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 20

who were at this meeting such as Mr. Cooper, Mr. O'Shaughnessy and Mr. LeQuieu received no aggravating role adjustment, while Jon Ritzheimer received a 2-level aggravating role adjustment and Mr. Payne received a 4-level increase. Moreover, on January 2nd, just prior to the protest rally, at an open meeting at the Ye Olde Castle restaurant in Burns, Ammon Bundy again divulged his plan to occupy the Refuge. If, as Blaine Cooper testified, the plan to go in, clear and occupy the Refuge had already been vetted and decided upon at the December 29th meeting, it would make no sense to divulge that idea in an open setting just a few days later.

It is of course true that Mr. Patrick was one of those who first arrived at the Refuge on January 2. This fact does not make him a leader. According to the trial testimony of numerous witnesses he was accompanied by the following persons: Blaine Cooper, Ryan Payne, Jon Ritzheimer, Ryan Bundy, Mel Bundy, Corey Lequieu, Brian Cavalier and Walter "Butch" Eaton. Of those charged and convicted in this case who were present initially at the Refuge only two have thus far received aggravating leadership enhancements: Jon Ritzheimer received a 2-level upward adjustment and Ryan Payne agreed to a 4-level upward adjustment. Blaine Cooper and Corey Lequieu both also present at the December 29th meeting discussed above received no aggravating role adjustment. Brian Cavalier, Ammon Bundy's personal bodyguard who was at Mr. Bundy's side throughout the remainder of the occupation also received no role adjustment. If attendance at the December 29 meeting and participation in the initial entry onto the Refuge do not yield aggravating role enhancements for defendant's Cooper and LeQuieu, they should not be cited in support of a request for an aggravating role adjustment in the case of Mr. Patrick.

### ii.    Mr. Patrick had no leadership role during the occupation itself.

There is no evidence to support the government's contentions that "Evidence indicated that

Patrick was a high-level leader and organizer of the conspiracy, from the beginning, who

recruited and organized gunmen and other followers on MNWR. *See Revised Final PSR at*

*paragraph 34(a).* Nor is there any evidence to support the government's contention that

**Patrick** played a central role during the occupation. He frequently appeared at press conferences

and Ammon and Ryan Bundy. He was also one of the last to leave the refuge. *See Revised Final*

*PSR at paragraph 34(b).* The Court is well aware of the various "roles" and "jobs" that other

codefendants assumed during the occupation. Mr. Patrick had no such involvement. By way of

examples:

- Mr. Patrick did not recruit and organize gunmen on the Refuge.

- Mr. Patrick did not appear in the initial press conferences announcing the occupation.

- Mr. Patrick did not frequently appear in press conferences during the occupation,

- Mr. Patrick did not participate in any negotiations or discussions with Harney County
  Sheriff Ward.

- Mr. Patrick did not participate in the meetings and negotiations with the FBI, at the
  TOC or otherwise.

- Mr. Patrick did not give lectures at the Refuge.

- Mr. Patrick was not part of the leadership group that traveled off the refuge on
  January 26 in order to speak to Grant County residents.

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 22

- Mr. Patrick did not interact in a leadership role with the various public figures who went to the Refuge.

- Mr. Patrick did not coordinate, train or advise anyone at the refuge on firearms, self-defense or other combat techniques.

- Mr. Patrick did not organize, lead or even participate in any of the so-called "security teams."

- Mr Patrick was not one of the last to leave the Refuge. He drove and walked out of the Refuge, turning himself in voluntarily at an FBI checkpoint on January 27, 2016. Numerous persons remained at the refuge for days afterward.

The Government points vigorously to Mr. Patrick's participation in the now public "Bunkhouse video" (Gov't Tr. Ex. 402, 403) as evidence of Mr. Patrick's leadership role. The Court should review this video. A careful review of this video suggests that the government's request to base a leadership role enhancement upon it is unfounded. Quite to the contrary the video supports a downward adjustment in Mr. Patrick's sentence. Of all the highly agitated, mentally unstable, and outright insane people speaking, Mr. Patrick is the only voice urging that the remaining occupiers sit tight peacefully.

Initially the video depicts Darryl Thorn, who received no leadership role enhancement, yelling out and calling on the radio that everyone must come in to make a decision. It is patently evident that Darryl Thorn is demanding a vote, not Jason Patrick. Mr. Patrick does then get on s to Mr. Thorn's radio and explains the purpose of the vote to the occupiers outside the bunkhouse. Much heated conversation ensues of which the most compelling parts involving Mr Patrick are

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 23

The Law Office of Andrew M. Kohlmetz
741 SW Lincoln St.
Portland, OR 97201
(503) 224-1104

these. First, Mr. Patrick tries to dissuade one individual from an announced plan to start a guerilla war and track down "the feds" and their families and execute them. Mr. Patrick explains calmly to this apparent psychopath that perhaps it is better to stand peacefully at the Refuge. Next is the government's star cooperating witness, Blaine Cooper. Early in the video Mr. Cooper mocks the conversation by stating that if they can't solve the current argument among themselves, how are they going to fight the feds. It gets worse. Mr. Cooper, a particularly unsavory sociopath, bigot, and felon goes on to state that in his opinion, the remaining occupiers should steal the Refuge's firetruck, put five "armed guys" in it, follow the other occupiers off the Refuge and precipitate a running gun battle with the FBI, stating "If they try to fuck with us, then lay lead down." A highly agitated Darryl Thorn then pipes up to state in effect that he does not want to run but rather wants to stay and fight. He shouts "We came here for one fucking reason, and that's to fight!" To this Mr. Patrick responds immediately that he did not come to the Refuge to fight, that he came to defend the Constitution. After some more heated discussion, Mr. Patrick then asks the group if they are ready to vote again on whether they should get on a convoy to Idaho – no doubt a result that would have either intentionally or inadvertently led to the loss of life – or to stay. A verbal vote is held and thankfully none of those present opted for the Blaine Cooper solution. At the conclusion of the vote it is again Darryl Thorn who states the vote was unanimous and they are staying. Mr. Patrick's participation in these conversations and vote should be applauded. He likely saved lives in calmly advocating that the occupiers remain and stand peacefully rather than starting a gun battle with law enforcement.

Mr. Patrick was visible and vocal during the occupation. He posted frequently to his facebook page. He was happy to speak with visitors. He gave solo interviews with various

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 24

members of the media. He took a lot of photographs and appeared in many as well. This however is not evidence that he had any degree of control or authority over others involved in the occupation. Such evidence it is insufficient to justify either a 4-level increase under U.S.S.G. § 3B1.1(a), a 3-level increase under subsection (b), or a 2-level increase under subsection (c).

### f.      Acceptance of Responsibility under U.S.S.G. § 3E1.1.

U.S.S.G. § 3E1.1(a) provides: If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels. This reduction is available to defendants who were found guilty after a jury trial. *United States v Ramos-Medina*, 706 F.3d 932, 940, (9th Cir. 2013), *United States v. Cortes*, 299 F.3d 1030, 1038-39, (9th Cir. 2002). Application note 1 to the Guideline provides the court with direction in its general application and provides:

> In determining whether a defendant qualifies under subsection (a), appropriate considerations include, but are not limited to, the following:
>
> **(A)** truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct). Note that a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection (a). A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection. However, a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility;
> **(B)** voluntary termination or withdrawal from criminal conduct or associations;
> **(C)** voluntary payment of restitution prior to adjudication of guilt;

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 25

(**D**) voluntary surrender to authorities promptly after commission of
the offense;
(**E**) voluntary assistance to authorities in the recovery of the fruits and
instrumentalities of the offense;
(**F**) voluntary resignation from the office or position held during the commission
of the offense;
(**G**) post-offense rehabilitative efforts (e.g., counseling or drug treatment); and
(**H**) the timeliness of the defendant's conduct in manifesting the acceptance of
responsibility.

Application note 2 to 3E1.1 speaks directly to the application of the reduction in those cases

where the defendant may have proceeded to trial and provides:

> This adjustment is not intended to apply to a defendant who puts the
> government to its burden of proof at trial by denying the essential
> factual elements of guilt, is convicted, and only then admits guilt and
> expresses remorse. Conviction by trial, however, does not automatically
> preclude a defendant from consideration for such
> a reduction. In rare situations a defendant may clearly demonstrate an
> acceptance of responsibility for his criminal conduct even though he
> exercises his constitutional right to a trial. This may occur, for example,
> where a defendant goes to trial to assert and preserve issues that do not
> relate to factual guilt (e.g., to make a constitutional challenge to a statute
> or a challenge to the applicability of a statute to his conduct). In each
> such instance, however, a determination that a defendant has accepted
> responsibility will be based primarily upon pre-trial statements and
> conduct.

Although application note 2 to 3E1.1 mentions only the preservation of issues that do not relate

to factual guilt, it does not preclude the consideration of other circumstances justifying an award

of the credit for a defendant who is convicted after trial. Provided the defendant manifests

"genuine contrition" he or she may contest factual guilt at trial and still qualify for the reduction.

*United States v. McKinney*, 15 F.3d 849, 852 (9th Cir. 1994). Furthermore, even if a defendant

does not technically qualify for a downward adjustment under the provisions of section 3E1.1,

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 26

the Court may credit a defendant's acceptance of responsibility by way of a downward

sentencing variance from the Sentencing Guidelines range under 18 UC 3553(a). *United States v.*

*Ramos-Medina*, 706 F.3d at 941.

      This is precisely the type of situation where a defendant who has been convicted after a

trial should be allowed the two-level acceptance of responsibility credit. Mr. Patrick proceeded

to trial in order to preserve his claims that his activities at the refuge were protected by the First

Amendment as a peaceful assembly seeking a redress of grievances as he understood it. He also

sought to preserve issues related to the constitutionality of the federal government's ownership

of the real property constituting the Refuge under Article 1, Section 8 clause 17 of the

Constitution (Application note 2.) His presence at the Refuge, and all activities he engaged in

there were a direct result and in response to what he believed was the unconstitutional and unjust

re-sentencing of the Hammonds and what he came to believe to be the unconstitutional holding

by the federal government of vast tracts of public land in the Western United States. Mr. Patrick

always admitted and never falsely denied his presence or activities at the Refuge. (*See*

*Application note 1(A)*). Even prior to the occupation of the Refuge Mr. Patrick was actively

announcing his intent to travel to Harney County on Facebook. He also telephoned Harney

County Sheriff David Ward and gave his staff his name and telephone number after leaving a

message that something had to be done about the Hammond case. Throughout the occupation he

was filmed, and quoted extensively as to why he was there and for what purpose. (*See*

*Application Note 1(H)*). His primary goal was to get these very issues before a court so they

could be litigated. After the arrests of the Bundy's and others on January 26th, Mr. Patrick shortly

thereafter on January 27, 2017, voluntarily and without any incident drove and walked off of the

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 27

Refuge and turned himself in at an FBI checkpoint. Thereby terminating any further role in the events.  (*See Application Note 1(B), and 1(D)*).

III.     **Mr. Patrick's personal history and characteristics.**

Mr. Patrick is before the court for sentencing after his first criminal conviction. He is a 45 year old self-styled political activist and journalist. He was born in 1973 to Vickie and Michael Patrick. As a young child he was raised in a military family. Mr. Patrick is the older of two siblings. His younger sister Kelli, still maintains a very close relationship with Mr. Patrick. Mr. Patrick is a divorced father of two grown children. His oldest child, son Jordan, is finishing up degree work at the University of Georgia. Jordan is married and his wife resides with Vickie Patrick in Mukilteo, Washington. Jordan intends to return there after finishing school. His younger daughter Kaitlyn recently earned an Associates Degree from Georgia Miltary College. She resides with her mother and works in the financial aid department at Georgia Military College.

According to the family Mr. Patrick's early childhood was a good, if unremarkable one. This changed as his father, Michael Patrick, a military combat veteran who served honorably during the Vietnam war became terminally ill with brain cancer. The family was told and believes that this cancer was a result of exposure to toxic chemical defoliating agents such as "Agent Orange" during Mr. Patrick's combat tour in Vietnam. After a long and difficult illness Michael Patrick passed away on December 17, 1984. Jason Patrick was only twelve years old when at the time of his father's death. At the military funeral Mr. Patrick was presented with the service flag at the end of the ceremony. Mr. Patrick's mother has described his father's passing

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 28

as devastating on Mr. Patrick. Mr. Patrick himself traces his distrust of government to his father's illness and death.

Mr. Patrick attended the Snohomish County Christian School in Federal Way Washington from kindergarten through high school. He was a middling student, maintaining a C average in his classwork. He participated in sports and lettered in soccer, making the varsity team when he was only in 7th grade. He also played basketball and ran track for the high school. According to his school principal, Jason was very active in the school sports coming court his programs as well as playing in the school band. "He was well thought of by his peers" and "elected to homecoming court."   After graduating he started working at a local bowling alley. He also volunteered as a soccer coach at Snohomish County Christian. He married his high school sweetheart Christy in 1992. The two had been dating since Mr. Patrick was a Sophomore in high school. They soon began a family. Their first child Jordan was born on April 3rd, 1993. Their second and last child, Kaitlin, was born on September 9, 1996. From 1996 until 2002 the young couple raised their family in and around the suburbs of Seattle. The children were placed in public schools, and the family regularly attended church. Mr. Patrick developed a professional specialty in roofing.

Mr. Patrick struggled to support the family as a roofing laborer He was often paid on a per-job basis by the hour and without benefits such as health insurance. Mr. Patrick began to plan the creation of his own roofing contracting business. He had heard from peers about booming construction work in Georgia. He further determined Georgia's tax laws were more favorable to small businesses such as the one he contemplated. He and Christy Patrick made the

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 29

decision to uproot the family and move to Georgia. In 2002 the family moved to Bonaire

Georgia, about 30 miles south of Macon Georgia and 100 miles south of Atlanta.

Soon after arriving in Georgia he formed his own roofing contracting company which he

named "Super Roofers." Starting with only himself, one truck and some tools, Mr. Patrick soon

employed as many as 28 people, running multiple crews on multiple jobs throughout the area.

Steven Jensen, a local builder and construction contractor who designed and framed many of the

houses which Mr. Patrick roofed, described the success of Mr. Patrick's company to a defense

investigator:

> there was a time when you could drive through the Bonaire/Warner-Robins
> area and you would see crews with those T-shirts on houses under construction
> at multiple job-sites. At that same time Jason was advertising in all the local
> magazines and papers and his business seemed to be going strong.

Mr. Patrick's crew all wore "Super Roofer" T-Shirts. The company sponsored local youth

and adult sports teams and even a local professional car racer. By 2007 and 2008 he and his wife

Christy had taken out loans of approximately $720,000.00 in order to purchase land and begin

construction of their dream home.

Mr. Patrick's success in life during the mid-2000's was reflected in other ways. He was

an active member in his local Church; The River Church in nearby Kathleen, Georgia. Local

witnesses described Mr. Patrick as deeply committed to the church and community. He coached

local youth soccer teams. He was active in the church's youth and men's ministries. He led the

organization of church fundraisers like barbeques and yard sales. He helped to organize and lead

church youth trips – including one to Jamaica.  Local witnesses interviewed by the defense

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 30

indicate that not only was Mr. Patrick deeply involved in the church, he was also instrumental in

a number of church-related projects aimed at helping the disadvantaged and those in need. Mr.

Patrick volunteered time and materials in support of the founding of a local shelter for victims of

domestic abuse. He spent many hours with people in the church he felt were marginalized or in

need of emotional and social support. In particular he became very involved with a young man

by the name of Wesley Renfroe who had been left paralyzed and confined to a wheelchair after a

car accident. Mr. Patrick along with a friend, Jason Howell, would often take Wesley out with

them to the races and even to go deer hunting. Both activities had been important to Wesley

before his accident. Because he was partially paralyzed he was no longer able to enjoy those

activities without the support of others like Mr. Patrick. Mr. Renfroe's father described to the

defense investigator how Mr. Patrick went out of his way to rig a rifle mount to Wesley's wheel

chair so that he could actually deer hunt again.

Another local friend of Mr. Patrick who too is a member of The River Church, David

Ballengee, also describes how Mr. Patrick reached out to and was instrumental in helping him.

Mr. Ballengee was injured while serving in Iraq. He was depressed and isolated, suffering from

PTSD. Mr. Ballengee credits MR. Patrick with saving his life by persisting in his efforts to get

him out of the house and engaged with the Church and other people after he returned from Iraq.

Mr. Patrick's good deeds extended beyond his local church and community. After

Hurricane Katrina devastated the Gulf Coast in 2005, Robert Conklin a local plumber and

business man began organizing a local relief effort to gather and coordinate the transportation of

supplies to storm-stricken communities in Mississippi. One of the people he approached was

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 31

The Law Office of Andrew M. Kohlmetz
741 SW Lincoln St.
Portland, OR 97201
(503) 224-1104

Jason Patrick. As described recently to the defense investigator Mr. Conklin related the following:

> Mr. Conklin was approaching people about doing something to aid those in need after Hurricane Katrina had devastated the Gulf Coast. Mr. Conklin told me that he was looking for people to help him organize the effort and Jason, who was about the third person he approached, immediately agreed to help and started calling around. In about three days-time they had raised about $12,000, which was enough money when coupled with the donations they had received, to fill eight pickups and trailers to capacity. Mr. Conklin said that the convoy hit the road and drove straight through to Mississippi. When they arrived they got situated with the local relief effort and began to hand out their supplies. He said that some of the folks, including Jason, stayed for a period of time to help in the ongoing relief effort before heading back to Georgia. Mr. Conklin stated that they made a second, smaller aid trip with five trucks and Jason was involved in that as well. He stated that they did not do it for recognition, but out of a genuine concern for the people affected on the Gulf Coast and that Jason jumped into action and was instrumental in leading the effort to raise money and gather supplies.

Sometime around 2008, however, Mr. Patrick's life began to take a turn downward. First came the general economic downturn which led to the Great Recession of 2008-12. Mr. Patrick's entire business, providing new and repaired roofing for residential construction projects, after years of growth faced a sudden and dramatic downturn. While no figures are available for the economy local to Mr. Patrick's business at the time the following national graph charting the national rise and fall of private residential investment illustrates the severity of the downturn.

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 32
The Law Office of Andrew M. Kohlmetz
741 SW Lincoln St.
Portland, OR 97201
(503) 224-1104



In the first quarter of 2006 Total national residential fixed investment was almost 896 billion

dollars. By the third quarter of 2010 that figure had plummeted to just less than 366 billion

dollars. See  https://fred.stlouisfed.org/series/PRFI as viewed 11/6/17) Mr. Patrick's business

began to suffer a dramatic downturn shortly after he and his wife had had secured over $700,000

in construction loans to build their dream home. By May of 2010, foreclosure proceedings on the

new property had been instituted against Mr. Patrick. The growing downturn in business had

undercut his capacity to make payments under the loans. Mr. Patrick's marriage also took a turn

for the worse and by the end of the year in 2010 he and Christy, after over 20 years together, had

separated. While the split was not exceedingly acrimonious, local witnesses describe it as having

an immediate and profound effect on Mr. Patrick.  Soon after the separation, Mr. Patrick walked

away from what remained of his business and moved out of the family home. Efforts to complete

construction of the family home were similarly abandoned.


DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 33
The Law Office of Andrew M. Kohlmetz
741 SW Lincoln St.
Portland, OR 97201
(503) 224-1104

After the failure of his marriage and the collapse of his business Mr. Patrick also withdrew from participation in church and community activities. Local witnesses have told the defense investigator that in their opinion the divorce, and to some extent business difficulties took a dramatic toll on Mr. Patrick. They describe an abrupt change coming over him as a result of these familial and economic stressors. Mr. Patrick was now living in the homes, and by the good graces, of neighbors. They describe even his personal hygiene suffering. Witnesses who knew him at the time described him as "lost," "depressed," or having just "given up." Mr. Patrick is described by these witnesses as simply walking away from everything. In June of 2013, the divorce was finalized. A defense expert has confirmed that Mr. Patrick continues to struggle with grief and loss related to the failure of his marriage and perceived "loss of his family. He meets criteria for a diagnosis of Major Depressive Disorder. (Confidential Supplement to PSR at page 4).

It was also about this time that local witnesses began to notice that Mr. Patrick spoke openly of the Constitution, and first began to dabble in politics. His first real involvement came through expressing local support and volunteering on behalf of Ron Paul's 2012 presidential bid. It was during this time, and while volunteering for Mr. Paul's campaign that he met Georgia Republican activist and lawyer Catherine Bernard. Ms. Bernard, who may appear at sentencing, got to know Mr. Patrick and after their work together for Ron Paul, she asked Mr. Patrick to volunteer for her own campaign to become a Georgia State Representative in the 2014 election. Mr. Patrick also assisted Ms. Bernard in her legal practice, once filming closing arguments in a criminal trial for her. While working with Ms. Bernard Mr. Patrick became more involved in state Republican politics. Many of Mr. Patrick's friends and acquaintances from the Bonaire area

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 34
The Law Office of Andrew M. Kohlmetz
741 SW Lincoln St.
Portland, OR 97201
(503) 224-1104

reported to the defense that they felt Mr. Patrick's segue into politics seemed to fill the gap in his

life that work and family had once provided. Despite the dramatic changes wrought in his life

during this period, his good nature continued to show.

Between 2012 and 2015, much of Mr. Patrick's political activism was focused on

highlighting what he felt was the unjustified militarization of the police. He felt, and still feels

strongly, that providing military equipment to local law enforcement is wrong and will serve to

only increase violent conflicts between law enforcement and civilians. He became and is an

ardent supporter of the Second Amendment's guarantee that the right to possess firearms shall

not be infringed. He is an advocate for open carry. These positions brought him into contact with

local law enforcement. For example, in 2013 he was involved in a local protest in Warner-

Robins, Georgia, a small city of approximately 70,000 people.  The participants were protesting

the local police department's plan to purchase an armored vehicle. (*See*

https://www.youtube.com/watch?v=c0HkOlowTrM ). Also in 2013, Mr. Patrick was accosted by

police officers while attending the 2013 Georgia State Republican Convention in Athens,

Georgia. Mr. Patrick relates that while lawfully and openly carrying a small handgun he was

stopped at gunpoint by local police. He was ultimately allowed on his way. In 2014, he was

arrested by local law enforcement when returning to a friend's house where he had been staying.

Local police had been called to settle a dispute between Mr. Patrick's friend and a neighbor. Mr.

Patrick attempted to film and record the interaction between his friend, the neighbor and the

police. Mr. Patrick was ordered to leave the property. When he disputed the lawfulness of the

order he was physically taken to the ground and arrested. (See

https://www.youtube.com/watch?v=M9dBGWNxDtM). In 2014, he spoke out publicly about the

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 35
The Law Office of Andrew M. Kohlmetz
741 SW Lincoln St.
Portland, OR 97201
(503) 224-1104

tragedy of a 19-month-old toddler who was critically injured when a local sheriff's deputy tossed a flash-bang grenade into his crib. (See for example http://www.ajc.com/news/deputy-face-trial-after-botched-baby-bou-bou-police-raid/JKuTmNMboFhhSyB0kAVYiL/) It is not surprising then that it was also in 2014 that he was charged with the trumped-up crime of making terroristic threats in the Warner Robins Municipal Court that are reflected in the Final Revised PSR at paragraph 64. Significantly, Mr. Patrick has been diagnosed with Post Traumatic Stress Disorder. This diagnosis has important ramifications when considering Mr. Patrick's actions and words. The defense expert concludes:

> He can be physically 'triggered' by authority figures who he believes are bullying or threatening him, and he often sees conspiracies or danger when there is none. This activates his "fight or flight" system, and rather than flee, Mr. Patrick will face the perceived threat. When triggered by a situation he feels is threatening, Mr. Patrick experiences a panic-like response, in which his heart starts racing and he begins shaking and sweating. He can also become verbally combative or flustered to the point that he has difficulty articulating his thoughts.

(Confidential Supplement to PSR at page 4). The presence of these physiological, mental and emotional reactions may be outwardly worrisome as they may be seen simply extensions of Mr. Patrick's clear disdain for authority figures who he believes are abusing their power. These reactions can be confused by others, significantly those to whom Mr. Patrick is directing his dissatisfaction, as evidence that he is unstable, dangerous or physically aggressive. He is not. As the defense expert concludes:

> Notably, Mr. Patrick's risk for engaging in physical aggression is very low, as he lacks most risk factors. He does not have a personality disorder, has no history of violence, and has no problems with substance use. His score on a formal risk assessment measure is 4 out of 40 possible points, which is exceptionally low and more consistent with average citizens with

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 36

> no criminal history than with violent offenders. Though he presents as
> verbally combative and physically imposing, Mr. Patrick is more
> philosophically aligned with non-violent forms of activism than violent
> expressions of protest. Mr. Patrick's methodology is to verbally confront
> figures of authority, with the hope that continued non-violent activism will
> heighten society's awareness about government corruption.

(Confidential Supplement to PSR at pp. 4-5). This is an extremely important observation as Mr.

Patrick's verbally confrontational interactions with those in positions of authority might be taken

subjectively as an indication that he is a violent or aggressive person. Again, he is not. He is an

individual with very strong opinions, a desire to speak them, a distrust of authority figures and

outright disdain for those who he feels are abusing their authority. This may make him difficult

or perhaps exasperating to deal with. But it does not mean he is at risk for escalating into

personal violence against others.

Mr. Patrick's activism is not motivated simply by disdain for authority however. Much of

of it can also explained by his fundamental desire to help people he sees as being in need. His

confrontations with authority are not undertaken simply because of his own disdain for authority,

but rather are an outgrowth of his desire stand up for those in need. This is a longstanding theme

in Mr. Patrick's life, reflected as far back as his days at Snohomish Christian Academy. It

continued through his involvement in family, church, and community activities during his

marriage and successful years as a roofing contractor. Moreover,  this impulse to help others

survived the drastic changes that occurred to and with Mr. Patrick after his divorce and failure of

his business.

It was while Mr. Patrick was working for Ms. Bernard in late January, 2014 when a

deadly snow and ice-storm struck the Atlanta area. The storm killed at least seven people and left

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 37

thousands of people stranded on iced over highways, many unprepared for the unusual wintry conditions. (*See* https://www.reuters.com/article/us-usa-weather/deadly-ice-storm-turns-atlanta-into-parking-lot-strands-thousands-idUSBREA0Q1DK20140129). Mr. Patrick, without any thought for his own safety took it upon himself to go out into the storm and help those in a need. As described in a contemporaneous news article:

> Jason Patrick doesn't wear a cape or an "S" on his shirt, but to many motorists stuck Tuesday and Wednesday alongside Atlanta's frozen roads, it doesn't make him any less of a superhero.
>
> "He's like an angel from God," said Douglas Hart, 59, of Atlanta, the first of several people Patrick helped during the snow and ice storm while going 42 hours without sleep. "He certainly was the answer to my prayers. No one else was able to help. The police couldn't do anything. But he came along in his big, four-wheel drive."
>
> Hart's situation was especially dire, since he takes a lot of medication related to a stroke he suffered three and a half years ago. He got caught in his work vehicle near Fulton Industrial Boulevard between 9 and 10 p.m. Tuesday. Hart said police were too overwhelmed to help him much, even though Hart went eight hours without taking medicine to control his blood pressure and other essential functions.
>
> Patrick, 41, a roofer in Bonaire, had only gone to Atlanta to take advantage of an invitation that state Rep. Larry O'Neal, R-Bonaire, had extended to the admitted political activist. Patrick's plan was to stay in Atlanta for the week to watch the Legislature in session and sit in on a few committee meetings…
>
> Hart was the first person Patrick gave a ride home, but he wouldn't be the last. In all, Patrick said he gave lifts to a dozen different motorists and was still helping through 11:30 p.m. Wednesday. In addition to giving rides and freeing trapped vehicles, Patrick also took food to a motorist who hadn't eaten in 21 hours.
>
> After taking someone else home, Patrick got a Facebook message at about 3 a.m. Wednesday asking for help from Brandi Underwood, 33, of Atlanta, who had been trapped in her vehicle since 3:30 p.m. Tuesday on Langford Parkway in southwest Atlanta.

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 38

Underwood is eight months pregnant…

Underwood had no food, and her gas was running low, forcing her to turn off the car's ignition for extended periods to preserve fuel. She said she talked several times to Patrick, who said he would help her despite the roads being iced over.

It took him hours to reach her car, and he didn't arrive until daybreak Wednesday. At one point, he had to drive in the wrong direction of an off-ramp, so he could pull his truck near her.

When Patrick arrived, he discovered the stretch of road was a divided highway, with a wall 7 feet high on his side of the road and a 5-foot wall on Underwood's side.Patrick drove his truck perpendicular to the wall, so the front of it touched the wall, in order to make it easier to climb down. He also enlisted the aid of several truckers who also were stuck. Each of them had a metal tool box that was about a foot tall, and they formed a makeshift set of stairs to help her climb over the two walls. "I was shaking, but everyone reassured me that they wouldn't let me fall," Underwood said. "Everybody was very supportive. It felt good."

After she made it over the top of one wall, the helpers tossed the toolboxes over the wall to make another set of steps to help Underwood down. Patrick then drove her to a nearby friend's house at 9 a.m.

"So many people don't care anymore," Underwood said. "He's just a guy with a truck. He's very innovative in his thinking. He was very calming to me in a very upsetting situation."

Patrick remains humble in his attitude. He even refused the $20 Hart offered him for gas.

"This guy is something else," Hart said. "He's a hero. He loves doing this. You don't see a lot of people willing to do this."

(full article at http://www.macon.com/news/local/community/houston-peach/article57004638.html#storylink=cpy as viewed 11/6/17). On June 28, 2014, Mr. Patrick was honored by the Red Cross as a "Disaster Relief Hometown Hero for helping approximately 18 stranded motorists during the storm. (See http://hhjonline.com/red-cross-honors-hometown-heroes-p4878-90.htm, as viewed on 11/6/17).

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 39

The Law Office of Andrew M. Kohlmetz
741 SW Lincoln St.
Portland, OR 97201
(503) 224-1104

In 2014, Mr. Patrick returned to the state of Washington, where his mother and sister reside. He returned to roofing, working for Bryan Loberg, a roofer he had known for many years, while also continuing to develop his political activism. Since approximately 2012 he has traveled across the country to document, speak out about, and draw attention to what he believes are examples of police brutality, government overreach and the trampling of individual rights and liberties by government actors. Prior to his incarceration in this case, he frequently used his social media accounts particularly his Facebook page to post articles concerning police brutality, police shootings of civilians, and other examples of what he perceived to be injustice. He believes strongly in individual freedom. He espouses classic libertarian views about the role of government and firmly believes that the federal government has exceeded its constitutional authority to the detriment of the individual. He believes it is his duty to stand with, and stand up for, those he feels have been wronged. These core beliefs explain why he reacted so strongly when learning of the "plight of the Hammonds."

Mr. Patrick is not a member of any other patriot group or militia. Mr. Patrick became familiar with some of the philosophical underpinnings of the Patriot movement through his work in Georgia Republican party circles in support of Ron Paul's presidential campaign in 2012. While Mr. Patrick has never considered himself to be "anti-government", he has since at least the death of his father been suspicious of the government and its motives. He has come to believe that everyday-Americans are suffering injustice at the hands of an out-of-control law enforcement culture and federal government.

What Mr. Patrick learned of the Hammonds and the course of their federal criminal trial resonated deeply with Mr. Patrick. To his understanding, the Hammonds were another

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 40

The Law Office of Andrew M. Kohlmetz
741 SW Lincoln St.
Portland, OR 97201
(503) 224-1104

unfortunate example of law enforcement and government abuse of power. Mr. Patrick has always been consistent in explaining his reasons for responding to the calls of others to come to Burns. For Mr. Patrick this was always about standing up for the injustices he perceived to have been perpetuated on the Hammonds. These injustices are rooted in what he believes to be the unwarranted and unconstitutional nature of federal ownership of large swathes of open land in the American west.

### IV.    Mr. Patrick's Guidelines Calculations and Sentencing Recommendation.

Mr. Patrick submits that his Base Offense level is 10 pursuant to U.S.S.G § 2X1.1, and 2A2.4(a). None of the proposed government enhancements or departures apply as argued above. Mr. Patrick request that the court give him a 2-level reduction in his offense level for his acceptance of responsibility under U.S.S.G. § 3E1.1(a). Thus Mr. Patrick's requested total offense level is 8. Mr. Patrick is in criminal history category I. The advisory sentencing guidelines range at 8-I is 0-6 months incarceration.

Mr. Patrick requests this court impose a sentence of time served on Count One of the Superseding Indictment. He further requests concurrent sentences on the three misdemeanor counts of conviction.

Mr. Patrick has previously agreed to a restitution judgment amount of $10,000.00 and requests no further fines or monetary sanctions be imposed.

Lastly, Mr. Patrick requests that the court not impose a term of supervised release. The Court is not required to impose such a term under 18 U.S.C. § 3583(a). If the court should elect to impose a term of supervised release, the maximum term for the felony count is three years. 18

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 41

The Law Office of Andrew M. Kohlmetz
741 SW Lincoln St.
Portland, OR 97201
(503) 224-1104

U.S.C. § 3583(b)(2). The maximum term on each of the misdemeanor counts is one year. 18

U.S.C. § 3583(b)(3). If ordered, multiple terms of supervised release must run concurrent to each

other. 18 U.S.C. § 3624(e).

Submitted this 9th day of February, 2018

*Andrew Kohlmetz*
Andrew M. Kohlmetz, OSB 955418
Standby Counsel for Jason Patrick

DEFENDANT'S OBJECTIONS TO REVISED FINAL PSR AND SENTENCING MEMO – 42

The Law Office of Andrew M. Kohlmetz
741 SW Lincoln St.
Portland, OR 97201
(503) 224-1104